# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HABEN BEYENE MICHAEL,<br><br>                              Petitioner,<br>v.<br><br>TAMMY FOSS, Warden,<br><br>                             Respondent. | Case No.: 19cv0158-AJB (NLS)<br><br>**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY** |

Presently before the Court is a Petition for a Writ of Habeas Corpus filed by Haben Beyene Michael pursuant to 28 U.S.C. § 2254 (ECF No. 1), along with Respondent's Answer (ECF No. 9), and Petitioner's Traverse (ECF No. 11). For the following reasons, the Court **DENIES** the Petition and **DECLINES** to issue a Certificate of Appealability.[1]

## BACKGROUND

Petitioner was convicted in the San Diego County Superior Court on two counts of first degree robbery, entered as a result of a guilty plea, and received a stipulated sentence of 26 years in state prison, enhanced as a result of his admission to the vicarious use of a firearm and two prior felony convictions. (ECF No. 1 at 2.) He claims his guilty plea was

---

[1] Although this case was referred to United States Magistrate Judge Nita L. Stormes pursuant to 28 U.S.C. § 636(b)(1)(B), the Court has determined that neither a Report and Recommendation nor oral argument are necessary for the disposition of this matter. *See* S.D. Cal. Civ.L.R. 71.1(d).

involuntary in violation of the Due Process Clause of the Fourteenth Amendment because it was coerced by trial counsel and a product of duress. (ECF No. 1-2 at 5-18.)

Respondent argues habeas relief is unavailable because the state court adjudication of the claim, on the basis the record does not support a finding of duress, is neither contrary to, nor an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts. (ECF No. 9-1 at 11-15.) Petitioner replies by arguing that the characterization of the record by Respondent and the state court that his plea was not a product of duress is erroneous, and that it was objectively unreasonable for the state court to find his guilty plea was not coerced. (ECF No. 12 at 4-9.)

## I.	State Court Proceedings

On October 15, 2015, Petitioner was charged in a six-count information with two counts of first degree robbery in violation of California Penal Code §§ 211 & 212.5(a), one count of first degree burglary in violation of California Penal Code §§ 459-60, one count of dissuading a witness from testifying by means of force or threat in violation of California Penal Code §§ 136.1(a)(1) & (c)(1), and two counts of false imprisonment by means of violence, menace, fraud or deceit in violation of California Penal Code §§ 236-37. (Lodgment No. 1, Clerk's Tr. ["CT"] at 7-12.) All counts included sentence enhancement allegations that Petitioner was vicariously armed with a firearm within the meaning of California Penal Code § 12022(a)(1), and four of the counts alleged he committed the offenses while on felony probation within the meaning of California Penal Code § 1203(k). (*Id*.) It was alleged he had a prior felony conviction for robbery which constituted a serious felony and a strike within the meaning of California Penal Code §§ 667(a)(1) & (b)-(i). (*Id*.) The information was later amended to add a prior felony burglary conviction from Utah which also constituted a serious felony and a strike. (CT 24-25.)

A preliminary hearing was held on October 28, 2015. (Lodgment No. 2.) Sharlene Zavala-Knight testified that she and her best friend Jeanna Fountain visited San Diego from Georgia in August 2015. (*Id*. at 2-4.) They were in the lobby of the Bahia hotel and were leaving to go to the Rock Fest when they first met Petitioner, whom she identified in court.

(*Id*. at 3-4.) Petitioner was with several other people and yelled out to Sharlene and Jeanna to "come hang out with us later." (*Id*. at 4-5.) When Sharlene and Jeanna returned to the hotel, they went to Petitioner's room where they talked and had a drink along with two other men and two other women. (*Id*. at 5.) They stayed in his room for thirty minutes to an hour before checking out and returning to Georgia. (*Id*. at 6.) Sharlene exchanged phone numbers with Petitioner and they kept in touch as Snapchat friends. (*Id*. at 6-7.)

Sharlene and Jeanna returned to San Diego on October 6, 2015 and stayed at a hotel in Mission Valley. (*Id*. at 7.) Jeanna notified Petitioner they were in town and he arrived at their hotel accompanied by two men about 10:20 p.m. (*Id*. at 10.) Sharlene and Jeanna were in the pool area when Petitioner arrived, and the group went back to the women's room about ten minutes later. (*Id*. at 11.) They stayed in the room dancing and drinking, although Jeanna did not drink, until about 2:00 a.m. when they asked the men to leave. (*Id*. at 11-12.) The men left without incident and the women went to bed. (*Id*.)

Sharlene said there was a knock on the door at 3:00 a.m.; she looked out the window and saw Petitioner; she opened the door "slightly" and asked what he wanted, and he said he had left his wallet in the room. (*Id*. at 12-13.) She looked at a table where he had placed his things earlier, saw nothing, told him there was nothing there and tried to close the door. (*Id*. at 13-14.) Petitioner pushed the door open, entered the room followed by another man, and pushed her on the bed. (*Id*. at 14.) The second man, whom she had never seen before, was holding a shotgun. (*Id*. at 14-15.) The men turned on the lights and Sharlene was able to clearly see their faces, which were not covered. (*Id*. at 15.)

Petitioner said: "Don't fucking move" and "this is what we do." (*Id*. at 16.) The other man grabbed both women, threw them against the door, and said: "Don't -- don't fucking look at me. Don't look at me. I'm going to shoot you if you look at me. It's over." (*Id*. at 16.) Sharlene and Jeanna were facing the door as Petitioner scavenged the room while the other man pointed the shotgun at their heads. (*Id*. at 16-17.) Sharlene said she tried to watch Petitioner and asked him not to take her identification, but the man with the shotgun kept saying: "Don't turn your head. Don't fucking turn your head." (*Id*. at 17.)

The man with the shotgun then forced the two women to face a different wall while touching them both as Petitioner yelled: "We're gangsters. This is what we do. We run this city. This is how we make our money." (*Id*.) Sharlene was wearing lingerie because she was expecting her boyfriend to arrive at 5:00 a.m. and said the man with the shotgun "was touching my - my arms, my legs, my butt." (*Id*. at 18.)

The women were forced to lie face down on a bed and covered with a blanket. (*Id*. at 19-20.) Petitioner yelled: "why don't you girls have any more money?" and "this is all you brought? You should have more money." (*Id*. at 20.) The man with the shotgun continued to touch Sharlene, and Petitioner whispered something to Jeanna before saying they would be gone in a minute. (*Id*.) Sharlene could see flashes, like photography, and Petitioner told them "we run this town. We'll find you. We'll find you," and told them to count to a thousand. (*Id*. at 20-21.) They had counted to 11 when they heard a door slam, peeked out from under the blanket, saw the room was empty, and ran into the bathroom. (*Id*. at 22.) Sharlene said she thought for certain they were going to be raped and was afraid she would never see her children again. (*Id*.) They could not call 911 from the hotel phone because the men had cut the wire, but Jeanna had a cell phone and called 911. (*Id*. at 22-23.) Sharlene said the men stole her wallet with credit cards, cash and two gift cards, as well as her cellphone, a necklace and the keys to her rental car. (*Id*. at 23.)

Jeanna Fountain testified to the same events and also identified Petitioner in court. (*Id*. at 33-52.) She said Petitioner cupped, grabbed and pinched her buttocks in the hotel room, that she thought she was going to be raped, and begged for her life. (*Id*. at 49-50.) At one point Petitioner whispered in her ear as he was groping her that "he remembers what buttocks looked like and that he would find me and kill me." (*Id*. at 65-66.) Her cellphone and i-Pad were stolen, but she had an old cell phone in the bottom of a bag which she used to call 911. (*Id*. at 52.) Jeanna identified Petitioner that night from a booking photograph the police located because he had given the women his true name. (CT 69.)

The hotel security camera recording showed three men approach the victims' room, two enter and one act as a lookout, but lacked sufficient focus to identify anyone. (CT 69-

4

70.) Petitioner lived with his parents and worked as an Uber driver, and several days later the police used a ruse of a group of women requesting an Uber ride to arrest him. (CT 70.) He told the police he was on probation for two robberies, including an armed home invasion in Utah, but requested a lawyer when they mentioned the victims' names. (*Id.*)

On May 31, 2016, Petitioner entered a guilty plea to two counts of first degree robbery. (CT 26-29.) The plea agreement included an admission that another principal was armed with a firearm and that Petitioner had two prior serious felony convictions and one prior strike conviction, with a stipulated sentence of 26 years. (*Id.*)

On June 24, 2016, Petitioner filed a pro se motion to dismiss his counsel based on allegations of ineffective assistance. (CT 30-37.) On August 9, 2016, represented by new counsel, he moved to withdraw his guilty plea contending he had been coerced into pleading guilty by defense counsel and had entered his plea under duress. (CT 38-41.) He alleged he had been in custody for about two months following his arrest when he hired private defense counsel in January 2016, and since then he:

> had very little contact or communication with his counsel. She made one jail visit in January and an appearance in Court in March where the communication between the two was terse and brief. She then visited him on the eve of trial after her second motion to continue was denied and she was unprepared to proceed to trial. Under these circumstances counsel told Mr. Michael to sign the plea deal or that she would withdraw from the case and that he would be left to represent himself.

(CT 38-41.)

The trial judge held a hearing on the motion to withdraw the guilty plea. (Lodgment No. 7 at 504-54.) Melissa Bobrow, the only witness to testify, said she was retained by Petitioner in early January 2016, after the preliminary hearing, with a trial date set for March 16, which was continued to June 1. (*Id.* at 506-07.) On May 25, she filed a motion to continue the trial date because she was awaiting a report from her expert witness on identification, which was "the entire defense." (*Id.* at 507.) Her motion was heard and denied on May 31, the day before trial, and the judge said the trial would begin the next day. (*Id.* at 508.) She testified that she was ready at that time to cross-examine the two

5

victims and the police officers and was ready to give an opening statement, but her expert witness had not yet provided a report and she was not comfortable calling him to testify based on what he had told her over the phone. (*Id*. at 509-11.) She had not yet subpoenaed her impeachment witnesses but was confident it could be done in time. (*Id*. at 509-10.) The prosecutor had previously offered life in prison, and about 10:50 a.m. that day the prosecutor made an offer of 26 years, which expired at the end of the day because the prosecutor had to decide whether to fly the victims in from Atlanta. (*Id*. at 512-13, 27.)

Counsel immediately conveyed the plea offer to Petitioner, spoke to him at the jail for about an hour just before noon, told him the offer was good for that day only, "strongly" encouraged him to take the deal, and told him "that we had absolutely no defense to this case and that after investigating the case and speaking with an expert, that winning this trial was unbelievably unlikely." (*Id*. at 513-14.) She described her trial preparation as having: (1) reached out to several attorneys for recommendations on identification experts, including the innocence project, and contacting five or six experts, one who said in "colorful language" that counsel had no type of mistaken identity defense whatsoever, and eventually hired Dr. Mitchell Eisen and sent him the discovery; (2) directed someone from her office to locate and investigate the witnesses who were at the hotel when the victims first met Petitioner in order to impeach their identification; (3) met with the public defender who had represented Petitioner at the preliminary hearing, obtained his case file and spoke with him extensively about the case; (4) consulted a criminal defense attorney in Atlanta she knew well, had the family hire an investigator in Atlanta, and reached out to the Georgia Bureau of Investigation, all in order to investigate the background of the victims, including their friends and family, which resulted in no basis to impeach them; (5) met with Petitioner in person three or four times and spoke with his brother over a dozen times; (6) researched eyewitness identification, including reviewing six to ten peer review articles; (7) reviewed discovery and prepared to cross-examine the prosecution witnesses; and (8) researched Petitioner's prior conviction in Utah to ensure it constituted a strike under California law. (*Id*. at 509-10, 525-26, 532-36, 539-40.)

Petitioner wanted to speak to his family before deciding to accept the plea offer, so counsel arranged for him to speak to his brother. (*Id*. at 515-16.) Counsel also spoke to Petitioner's brother that day, who told her he was not a lawyer and did not know what to tell Petitioner, but eventually told counsel to advise Petitioner to accept the deal. (*Id*. at 515-17, 529.) Counsel met with Petitioner again for about two hours after lunch. (*Id*. at 517-18.) She told him over ten times it was in his best interest to take the deal, saying something like: "You decided to rob a person using no disguise who knew you, who you have been in contact with. They are going to come into court and say exactly that. I have spoken with the public defender on this case. I have researched. I have investigated the girls. There is absolutely no dirt on them. My understanding is that they make quite sympathetic witnesses." (*Id*. at 518-20.) At one point during that two-hour conversation Petitioner decided he did not want to take the deal, and counsel told him "that the same idiot brain that decided to continue robbing people without a mask on multiple occasions was the same idiot brain that was refusing to take this deal." (*Id*. at 521.) When Petitioner said he was upset that he had not been able to speak to his father, defense counsel told him: "Your father doesn't know what actually happened so, of course, he is going to tell you to fight the case. He thinks you are innocent. I don't understand why you would want to confer with someone who doesn't know anything about the case, about what to do with the case." (*Id*. at 519, 521.) Defense counsel asked him repeatedly why he was not taking the deal, which caused him to "shut down and stop[] answering my questions completely." (*Id*. at 522.) Defense counsel said she then began using "colorful language" and "dropping F-bombs," which started Petitioner talking again. (*Id*. at 522-23.) She "probably" used language such as: "Stop acting like a fucking little kid and man up." (*Id*. at 523.) Counsel said it was about 4:00 p.m. when Petitioner finally agreed to the deal, just after she told him his brother had told her to advise him to accept the deal. (*Id*. at 523, 533-31.) Counsel said she never told Petitioner that if he did not accept the plea offer she would withdraw her representation, but said she told him that if he stopped communicating with her she would have to withdraw. (*Id*. at 524.)

7

The trial judge denied the motion to withdraw the plea, stating:

> There is inherent in criminal proceedings a certain amount of pressure on any defendant. The issue in a case like this is whether there is undue pressure rising to the level of duress or coercion that exceeds that which is inherent in the process of facing criminal charges. It is present in any criminal case. It is exacerbated in a criminal case where the penalty at stake ultimately is life in prison.
>
> The pressure increases [in] any criminal case when there is a day at which the criminal proceedings will be concluded, and that is the day trial commences and/or a verdict is rendered. The pressure must be incredible at the point where [you] get to the end of the case and there is no good cause for a continuance and there is no perceptible defense to the charges.
>
> It would be a far different situation if you were at a place in the case where there was good cause for a continuance and a real defense that one could predict could be developed within a reasonable period of time. That's very different than this case.
>
> Based upon the evidence that I heard, there was no good cause that could be articulated for a continuance. The hope that if given enough time, that some evidence might materialize is not good cause, especially as long as this case had been going on.
>
> What I did not hear today was that there was a defense that could be presented and a witness that could be obtained within a reasonable period of time who could be predicted to give evidence that would support that defense. In fact, what I heard today was, frankly, that as far as had been explored, and it had been explored, it was very unlikely that any defense would be developed.
>
> Eyewitness identification is very important in cases where it applies where strangers have brief and traumatic interaction with one another and the identification is complicated by a number of issues, which are well documented in legal literature, including cross-cultural identification, identifications made between different ethnic groups.
>
> This is a case where not only was there a period of time where the individuals had interactions with each other long before the criminal events occurred, but there was a previous incident at which they became acquainted with one another.

8

19cv0158-AJB (NLS)

The pressure also is increased when, in fact, consistent with the duty of candor, an attorney tells you that your situation is not good, grim and perhaps hopeless.

The pressure becomes increasingly brought to bear in a very normal sense when you are looking at an indeterminate life sentence for which the State of California is famous and for which there is not prediction that you will ever actually be paroled, and something truly remarkable happens due to perhaps skillful lawyering when an offer of determinate sentence is offered. Those are all natural and normal pressures.

Turning to counsel's performance in this case, I have heard nothing that would indicate to me that there was any performance that was not consistent with the standards of care for a reasonably competent criminal defense practitioner.

In fact, I have mentioned the duty of candor before. I think that's extremely important in the practice of criminal law defense.

Clients can hope forever for continuances. They can hope forever to delay the judgment day. Part of the criminal justice system's very delicate balancing act is to give plenty of time but not to give unlimited time so that the court system becomes hopelessly clogged with cases that should have been resolved long before they eventually are resolved.

The duty of candor is extremely important, and sometimes when people are in an emotional state not wanting to deal with the realities of the situations that they themselves have created for themselves, colorful and adult language is not unknown to the criminal justice system and probably, frankly, is within the standard of practice. It is a way to effectively communicate when individuals are at the point of not making decisions that would be in their best interest.

The dynamics of this situation does not shock the Court nor does it concern the Court about the voluntariness. All of this preceded an opportunity in the courtroom where the plea was taken by a Court that is very sensitive to the pressures placed upon criminal defendants, a Court that is committed to not permitting people who believe that they are innocent to enter a guilty plea.

The plea would have been rejected had he done anything other than say under oath to me that he was guilty of the charges and that's why he was

pleading guilty, that he had adequate time to discuss the situation with his lawyer, and that he thought that this deal was in his best interests. If there had been any reluctance on any of those things, the plea would not have been accepted by the Court. [¶] I find there is no good cause to withdraw the plea. The motion is denied.

(*Id*. at 547-50.)

Petitioner was immediately sentenced to the stipulated term of 26 years. (*Id*. at 551-53.) He appealed, raising the claim presented here. (Lodgment Nos. 8-10.) The appellate court affirmed, stating:

> Michael's argument that he acted under duress is simply not supported by the record. He certainly faced a difficult choice in pleading guilty to crimes that would result in a 26-year prison term. The pressure was not made easier by the fact he was facing a sentence potential which would keep him in prison for the rest of his life. It is clear his counsel vigorously attempted to persuade Michael to plead. While counsel was very vigorous and "colorful" in her efforts, the trial court found no improper pressures or duress. Counsel did not threaten to withdraw if Michael did not plead. She testified she was prepared for trial and did not tell Michael that she was not prepared. Counsel had done investigation of the victims, identified impeachment witnesses and had contacted experts on an eye witness identification defense. She had largely been unsuccessful in developing such a defense.
>
> One expert made clear to her that there was no eye witness identification defense available here. That is understandable since Michael had prior contact with the victims, and had visited with them the year before. Robbing people you know is not likely to produce a winning eye witness defense.
>
> Michael relies on *People v. Young* (1956) 138 Cal.App.2d 425. There the defendant was told defense counsel was unprepared and the defendant could plead or face trial with an unprepared counsel. The court in *Young* found defense counsel's actions unduly influenced the defendant's decision to plead guilty. (*Id*. at pp. 426–427.) This case is different than that which was presented to the court in *Young*.
>
> In this case the trial court found that counsel was prepared and had not threatened or unduly influenced the defendant. Counsel undoubtedly tried to convince Michael that the "deal," as harsh as it was, was still his best

alternative. She thoroughly discussed his circumstances and contacted Michael's brother for advice, which was related to Michael before he decided to plead. The trial court observed the testimony at the motion hearing and observed Michael at the change of plea. We are satisfied the trial court acted well within its discretion in denying the motion to withdraw the guilty pleas. There was no abuse of discretion and no denial of due process.

(Lodgment No. 11, *People v. Michael*, No. D071197, slip op. at 6-7 (Cal.App.Ct. Aug. 24, 2017).)

## II. Petitioner's Claim

Petitioner claims his guilty plea was coerced and a product of duress and therefore involuntary under the Fourteenth Amendment because: (1) defense counsel only visited him twice before trial and had not prepared a legitimate defense by the trial date, but was relying on a pending eyewitness expert report which would have been ineffectual, showing trial counsel's strategy all along was to settle the case; (2) he was under pressure to either accept the offer or begin trial the next day without a defense, and the prosecutor took advantage of those circumstances by giving him several hours to consider a deal for 26 years in a case where the victims merely had property taken from them and were not injured; and (3) when all that pressure became unbearable defense counsel berated him and called him an idiot, and took advantage of his desire for family input by convincing his brother to advise him to take the deal. (ECF No. 1-2 at 13-17.)

## III. Discussion

For the following reasons, the Petition is denied because the state court adjudication of Petitioner's claim is objectively reasonable within the meaning of 28 U.S.C. § 2254(d).

### A. *Standard of Review*

Under the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, in order to obtain federal habeas relief with respect to a claim which was adjudicated on the merits in state court, a federal habeas petitioner must demonstrate that the state court adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal

law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West 2019).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407. In order to satisfy § 2254(d)(2), the factual findings relied upon by the state court must be objectively unreasonable. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

### B. *Petitioner is not entitled to relief*

Clearly established federal law provides that a guilty plea must be knowing, voluntary and intelligent, and "with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 747-55 (1970); *Boykin v. Alabama*, 395 U.S. 238, 242 (1969) (requiring the record to reflect the defendant understands, and is voluntarily waiving, his rights). "The standard [for determining the validity of a guilty plea] was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970).

Petitioner argues that his guilty plea was a product of duress by trial counsel, and therefore involuntary under the Fourteenth Amendment, because defense counsel had been representing him for several months on a case carrying a life sentence but only spoke to him twice before trial and had not prepared a legitimate defense by the trial date, but was relying on a pending eyewitness expert report which common sense dictates would have been ineffective, a conclusion reached by both state courts, and counsel had not yet

interviewed impeachment witnesses from his first encounter with the victims. (ECF No. 1-2 at 15.) He argues that the reliance on the eyewitness expert was a distraction used for settlement purposes, and not a legitimate defense, which shows trial counsel's strategy all along was to settle the case and used the expert to convince Petitioner to accept the plea offer. (*Id*. at 17.) He was therefore under duress to accept the offer or begin trial the next day without a defense, which was exacerbated by the prosecutor taking advantage of the situation and giving him several hours to consider a deal for 26 years in a case where the victims merely had property taken from them and were not injured. (*Id*.) It was at that point that defense counsel began to berate him, calling him an idiot, going beyond the level of candor and tough talk permitted during an attorney-client discussion, and took advantage of his desire for family input by convincing his brother to advise him to take the deal. (*Id*. at 16-17.)

Respondent answers that Petitioner has not overcome the presumption of correctness of the state court finding that defense counsel was prepared to go to trial despite not having a winning defense. (ECF No. 9-1at 11-13.) Respondent also argues that the determination by the state appellate court that Petitioner freely, knowingly and voluntarily relinquished his federal constitutional rights during his change of plea hearing is objectively reasonable, as is the appellate court determination that the guilty plea was not a product of duress by defense counsel because counsel correctly identified the weakness in the defense, namely, the fact that Petitioner did not use a disguise when he robbed people he was acquainted with who would make sympathetic witnesses. (*Id*. at 12-15.)

Petitioner replies that even if the change of plea hearing supports a finding that he entered his plea voluntarily as the state court noted, it could still have been the product of the earlier coercion. (ECF No. 11 at 6.) He disputes the finding that counsel was prepared for trial, arguing that counsel could not have been prepared to give an opening statement and cross-examine witnesses as she stated during her testimony at the hearing on the motion to withdraw the plea because she had not received her expert's report and had not interviewed the impeachment witnesses. (*Id*. at 7.)

13

19cv0158-AJB (NLS)

Petitioner first contends this Court should review the claim without AEDPA deference because the appellate court did not reach the federal due process issue but denied his claim on the basis that the trial judge did not abuse his statutory discretion to deny the motion to withdraw the plea. (ECF no. 1-2 at 13-14.) "Before we can apply AEDPA's standards, we must identify the state court decision that is appropriate for our review. When more than one state court has adjudicated a claim, we analyze the last reasoned decision." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005), citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-06 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim [are presumed to] rest upon the same ground.")

Petitioner presented his claim to the state appellate and supreme courts on direct appeal. (Lodgment Nos. 8-13.) The state supreme court denied relief in an order which stated in full: "The petition for review is denied." (Lodgment No. 13.) As quoted above, the appellate court found that defense counsel conducted a thorough investigation, was prepared to go to trial, had accurately surmised and communicated to Petitioner there was very little chance of success at trial, vigorously, thoroughly and colorfully discussed his circumstances with him and his brother without threatening or unduly influencing Petitioner, and without exerting more pressure than is typical or could be expected under such circumstances or outside the norm of attorney-client candor. The appellate court then concluded that, in light of the trial judge's observation of Petitioner at the hearings on the change of plea motion to withdraw: "There was no abuse of discretion and no denial of due process." (Lodgment No. 11, *People v. Michael*, No. D071197, slip op. at 7.)

The claim presented to the appellate court alleged the trial judge abused his discretion under the state penal code and state constitution (Lodgment No. 8 at 17-19), as well as alleging a violation of Petitioner's federal due process right to be free of duress when pleading guilty as protected by the Fifth, Sixth and Fourteenth Amendments. (*Id*. at 18; Lodgment No. 10 at 10, 13.) In support of the latter proposition he cited *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (recognizing that the United States Supreme Court has

"pointed out that courts indulge every reasonable presumption against waiver of fundamental rights and that we do not presume acquiescence in the loss of fundamental rights.") (internal quote marks and citations omitted). (*Id.*)

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 68, 99 (2011), citing *Harris v. Reed*, 489 U.S. 255, 265 (1989) (holding that there is a presumption the state court reached the merits of a federal claim even when it is unclear whether the decision appeared to rest on federal grounds or was decided on another basis). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 99-100.

Petitioner has not identified any reason to find it is more likely that the state appellate court denied his claim solely on state law rather than also addressing the federal aspect of the claim. Rather, in using the concluding phrase: "There was no abuse of discretion and no denial of due process," it is more likely the state appellate court was indicating a rejection of both the state and federal claims raised by Petitioner on appeal. Petitioner has failed to rebut the presumption that the state appellate court reached the merits of his federal due process claim. *Id.*; *see also Killian v. Poole*, 282 F.3d 1204, 1207-08 (9th Cir. 2002) (holding that AEDPA deference does not apply to claims presented in state court only where "no adjudication on the merits in state court was possible.") Accordingly, the state appellate court opinion on direct appeal is the last reasoned state court decision to address the claim, and the provisions of 28 U.S.C. § 2254(d) apply to that decision.

One of the factors relied on by the appellate court to find a lack of duress is that the trial judge "observed the testimony at the motion hearing and observed Michael at the change of plea." (Lodgment No. 11, *People v. Michael*, No. D071197, slip op. at 7.) The trial judge stated that: "The plea would have been rejected if had he done anything other than say under oath to me that he was guilty of the charges and that's why he was pleading guilty, that he had adequate time to discuss the situation with this lawyer, and that he

15

thought this deal was in his best interests." (Lodgment No. 7 at 550.) Petitioner did in fact make those statements under oath at the change of plea hearing, where he answered "yes" when asked: "You've had adequate time to discuss your situation with your lawyer, including the possibility of going to trial and what the outcomes might be, right?" and "you've talked about the possible defenses, right?" and "you've made an assessment that this is a bad situation, but you're making the best of it, right?" (Lodgment No. 6 at 404.)

The United States Supreme Court has held that a defendant's representations at the time of his guilty plea "constitute a formidable barrier in any subsequent collateral proceedings" because "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). It was objectively reasonable for the state court to find that Petitioner, who was 23 years old at the time he entered his plea (CT 66), facing near certain conviction on charges which carry a life sentence, voluntarily decided, after adequate time consulting with his attorney who had investigated the case but had been largely unsuccessful in developing a defense, that it was in his best interests to accept a plea offer of 26 years rather than go to trial without a viable defense. *See Hill v. Lockhart*, 474 U.S. 52, 56 (1985) ("The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'"), quoting *Alford*, 400 U.S. at 31.

Petitioner is correct that "agents of the government may not produce a plea by actual or threatened physical harm or by mental coercion overbearing the will of the defendant." *Brady*, 397 U.S. at 750. However, it was objectively reasonable for the appellate court to reject any claim Petitioner's will was overborn by the pressure put on him by the prosecutor to decide within a few hours. The prosecutor had previously offered life in prison on a case she was nearly certain to win, and the time limit on the new offer was reasonable because the trial was to begin the next day and the prosecutor had to decide whether to fly the victims in from Atlanta. Petitioner's contention that the prosecutor took advantage of the situation by offering a lengthy sentence on a case where he merely robbed two women of property without injuring them is likewise without merit. The preliminary hearing

16

19cv0158-AJB (NLS)

testimony of the victims established they were terrorized with a shotgun in their faces, subjectively believed they would be raped as both men groped and manhandled them, and objectively feared for their lives as both men repeatedly threatened to kill them. Petitioner has not shown the time pressure he was under to take the deal was contrived by the prosecution or that agents of the government produced the plea by mental coercion overbearing his will. *Id*.

Finally, Petitioner attempts to overcome the fact that the record of the change of plea hearing indicates a knowing and voluntary plea by showing it was the product of duress and coercion. To do so he must show it was objectively unreasonable for the appellate court to find that the pressure he was under to accept the deal caused duress which rose to the level of a federal due process violation. Petitioner has not rebutted the factual finding by the state court that defense counsel did not threaten to withdraw her representation if he refused the deal as alleged in his motion to withdraw the plea. She testified she told him she would have to withdraw if he refused to speak to her and refused to cooperate with her. Petitioner acknowledges the state court made such a finding, but contends it is not relevant to whether the pressure counsel applied rendered his plea involuntary. (ECF No. 11 at 6.) However, the "pressure" Petitioner contends was applied by his defense counsel in fact constituted an accurate estimation of his chances at trial following a thorough investigation and an adequate preparation for trial. Petitioner challenges defense counsel's statement she was prepared for trial, arguing she could not have been prepared to go to trial without a viable defense or without further investigating her eyewitness identification defense by obtaining her expert's report and interviewing the impeachment witnesses. However, he has not identified an alternate defense to the charges or how more time to decide would have helped. As the trial judge noted, this is not a situation where further investigation or continuances might have resulted in a viable defense. Rather, without making any attempt to disguise himself, Petitioner robbed and terrorized two women he had met socially on two different occasions, apparently relying, for protection against them reporting his crime to the police, on his stated reputation as a gangster who runs San Diego with the resources

to find and kill them whenever he liked. Defense counsel determined through three sources, the Georgia Bureau of Investigation, an Atlanta attorney she knew well, and an investigator in Atlanta, that the victims would make sympathetic and believable witnesses. Counsel testified that the only possible defense was to challenge the identification of Petitioner, and that she had explored that avenue through contacting experts on eyewitness identification and retaining one, researching this issue in peer review articles, and locating witnesses to the victims' first encounter with Petitioner in the Bahia hotel in the hope of challenging the identification. Defense counsel spoke with her expert, knew the limitations of his testimony, and had someone from her office investigate the eyewitnesses from the Bahia hotel. Even if Petitioner is correct that those avenues would not have developed a viable defense, he was apprised of that by counsel, and has identified no other possible defense or any benefit from more time to consider the plea offer. It was objectively reasonable for the state court to reject his contention that defense counsel was not prepared for trial.

In sum, the pressure Petitioner felt to decide whether to accept a 26-year sentence the day before he was set to go to trial without a viable defense was, as the appellate and trial courts correctly noted, a difficult choice but a natural and normal one under the circumstances, in fact typical. Defense counsel's adamant, repeated and eventually "colorful" insistence that the plea was in his best interest represented a precise, accurate and truthful account of his situation. In fact, had defense counsel been more solicitous of Petitioner's consideration of his option of going to trial, counsel may have done him a disservice. *See Iaea v. Sunn*, 800 F.2d 861, 865 (9th Cir. 1986) ("Because 'an intelligent assessment of the relative advantages of pleading guilty is frequently impossible without the assistance of an attorney,' counsel have a duty to supply criminal defendants with necessary and accurate information."), quoting *Brady*, 397 U.S. at 748 n.6.

It was not objectively unreasonable for the state court to find Petitioner was under the ordinary pressure attendant upon criminal defendant rather than being coerced into entering his plea, and to find that his plea represented "a voluntary and intelligent choice

among the alternative courses of action open to the defendant." *Alford*, 400 U.S. at 31; *Brady*, 397 U.S. at 751 ("We decline to hold, however, that a guilty plea is compelled and invalid under the Fifth Amendment whenever motivated by the defendant's desire to accept the certainty or probability of a lesser penalty rather than face a wider range of possibilities extending from acquittal to conviction and a higher penalty authorized by law for the crime charged.") Petitioner is not entitled to federal habeas relief because he has failed to show that the state court adjudication of his claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West 2019).

## V. Certificate of Appealability

"[T]he only question [in determining whether to grant a Certificate of Appealability] is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Buck v. Davis, 580 U.S. ___, 137 S.Ct. 759, 773 (2017). The Court finds a Certificate of Appealability is not appropriate under that standard as to any claim or procedural issue presented.

## CONCLUSION

Based on the foregoing, the Petition for a Writ of Habeas Corpus (ECF No. 1) is **DENIED** and the Court **DECLINES** to issue a Certificate of Appealability. The Clerk of Court shall enter judgment accordingly.

Dated: August 22, 2019

Hon. Anthony J. Battaglia
United States District Judge